IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| DR. MARY (aka Molly) SHANAHAN | : |
| | : Case No. |
| Plaintiff, | : |
| | : Judge |
| v. | : |
| | : |
| DENISON UNIVERSITY | : |
| | : |
| Defendant. | : |

**COMPLAINT**

Plaintiff Dr. Mary (aka Molly) Shanahan, by and through her undersigned counsel, herein files the following Complaint against Defendant Denison University ("Denison").

**NATURE OF THE CLAIMS**

1. This is an action for relief from employment discrimination in violation of Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"), Title VII of the Civil Rights Act of 1964, Ohio Revised Code § 4112.02 (unlawful discriminatory practices) and Title IX of the Educational Amendments of 1972.

2. Dr. Shanahan alleges that Denison unlawfully discriminated against her on the basis of her gender and disability in violation of the ADA Title VII of the Civil Rights Act of 1964, Ohio Revised Code § 4112.02 and Title IX of the Educational Amendments of 1972, and

3. Dr. Shanahan seeks compensatory damages, punitive damages, liquidated damages and reasonable attorneys' fees and costs as remedies for Defendant's violations of her rights.

**PARTIES**

4. Plaintiff is a natural person residing in Granville, Ohio.

5. Upon information and belief, Defendant Denison is an Ohio non-profit corporation with its principal place of business in Granville, Ohio.

1

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as they involve questions of federal law.

7. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency and fairness to the parties.

8. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Ohio.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. As to those claims that require the exhaustion of administrative remedies, Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

10. On or about May 5, 2023, the EEOC notified Dr. Shanahan of her right to sue. (Exhibit 1).

## FACTUAL ALLEGATIONS

11. Dr. Shanahan is both female and disabled and is therefore a member of at least one protected class. She began her employment as a tenure track Assistant Professor of dance on or about August 15, 2019. Dr. Shanahan is also an alumna of Denison's class of 1990.

12. In 2017, when Dr. Shanahan was a visiting professor at Denison, she made a Title IX report of rape and stalking to Denison's then-Title IX Coordinator Steven Gauger concerning events that occurred when she was a student at Denison. Mr. Gauger handled the matter

professionally and supportively. Subsequently, and on more than one occasion, Dr. Shanahan sought supportive measures from Title IX and Provost Kim Coplin due to her concerns about her safety and mental health and reasonable concerns about retribution, connected to the perpetrator's possible resumption of stalking and stemming from the circumstance that her perpetrator's children enrolled at Denison concurrent with Dr. Shanahan's return as a faculty member.

13. On or about November 8, 2021, Dr. Shanahan sought an accommodation under the Americans with Disabilities Act ("ADA") and reported matters connected to her own and a student's Title IX claims, through an attorney.

14. After that request, Denison failed to participate in the interactive process required by the ADA, failed to provide support to Dr. Shanahan as a Title IX Complainant, and failed to follow up appropriately on the Title IX matters she reported.

15. In light of the extraordinary circumstances surrounding the matters Dr. Shanahan was facing, and has since faced, Dr. Shanahan alleges that Denison responded with "deliberate indifference."

16. Dr. Shanahan or her representative complained about these failures to, among others, and in an attempt to address the matter proactively, Denison's president Adam Weinberg and Denison's human resources department. Dr. Shanahan also subsequently asked Jackson if she had handled reporting matters appropriately and Jackson was reassuring and instructed Shanahan to share the documentation of their correspondence and information that Dr. Shanahan had provided Jackson should anyone at the school allege otherwise.

17. Instead of engaging the interactive process required by the ADA, and failing to see that Dr. Shanahan was also making a Title IX report to a member of Denison's staff—Pamela Prescod-Caesar, Denison's then-Vice President of Human Relations—for whom report of

prohibited activity constitutes "actual notice" and therefore triggers Denison's response obligations, Denison summarily denied Dr. Shanahan's disability accommodation requests, failed to provide supportive measures Dr. Shanahan was entitled to under Title IX, including for a meeting with Title IX that Prescod-Caesar insisted she have and which would include reference to Dr. Shanahan's Title IX matter and perpetrator. In retaliation for her having made those accommodation requests, and in retaliation for her Title IX status and report, Denison retaliated against Dr. Shanahan by first threatening a Title IX investigation into her conduct, and then, abandoning that tack because, upon information and belief, a Title IX investigation would have meant providing the process protections guaranteed by Title IX, Denison began the process of terminating her, based on unfounded and pretextual allegations.

18. Prescod-Caesar emailed Dr. Shanahan on November 9, 2021 denying Dr. Shanahan's request for accommodations.

19. Prescod-Caesar failed to even acknowledge that Dr. Shanahan is a Title IX Complainant and/or that Mr. Brescoll's letter shared details connected to that complaint that were relevant to the request for accommodations, and failed to follow up appropriately on the Title IX information Dr. Shanahan shared.

20. Instead, Prescod-Caesar zeroed in only on her mistaken and unsubstantiated assumptions—and upon information and belief Prescod-Caesar was counseled in her response by Provost Kim Coplin and/or General Counsel Alexandra Schimmer—that Dr. Shanahan had mishandled the student matter referenced in Dr. Shanahan's accommodation request and Title IX report.

21. In a meeting on November 10, 2021 Jackson also failed to offer Dr. Shanahan a support person or any other Title IX supportive measure in connection with a required meeting,

4

which Jackson knew would include reference to Dr. Shanahan's perpetrator and matters connected to her Title IX case.

22. Jackson was nonetheless—or appeared to be—professional and supportive, and appropriately acknowledged both that Dr. Shanahan was a Title IX Complainant and the complexity of the student matter in relation to Dr. Shanahan's Title IX claim.

23. Prescod-Caesar emailed Dr. Shanahan again on November 11, 2021 instructing her to discontinue what she viewed as Dr. Shanahan's "personal entanglement" with the student matter and, again without acknowledging that Dr. Shanahan is a Title IX Complainant, notifying Dr. Shanahan that Denison was assessing her accommodation request as a possible violation of the Denison University's Policy Prohibiting Sex Discrimination under Title IX ("Title IX policy").

24. Prescod-Caesar's instruction was in violation of Denison's Title IX policy, as well as the Title IX statute, which prohibits retaliation against complainants including threats and intimidation, and prohibits the placement of restrictions limiting with whom a Title IX complainant may discuss their claim.

25. Thereafter and in multiple instances, Denison's leaders, including Prescod-Caesar, Coplin, Schimmer, and Weinberg, told Dr. Shanahan that the only way that she could avoid the termination proceedings would be to resign, accept a separation package and sign a release that contained provisions purportedly releasing all her claims against Denison and also a broad non-disclosure agreement including that she would not disparage Denison and would keep the terms of the agreement confidential.

26. When she refused to sign the agreement, Denison brought numerous unfounded charges against her and held hearings before The President's Advisory Board—composed of Dr. Frank "Trey" Proctor III, Dr. Geoff Smith, Dr. John Davis, Dr. May Mei, Dr. K. Christine Pae,

5

and Professor Micaela Vivero, MFA—on May 7th and 31st, ("Hearings") at which Dr. Shanahan was not permitted to testify or answer her attorney's questions, nor was she or her counsel permitted to make opening or closing statements, nor were they permitted to question the complete list of individuals Dr. Shanahan submitted to testify or be questioned. .

27. Denison's charges stemmed from the unsubstantiated assumptions and false allegations made by Prescod-Caesar, who upon information, belief, and based upon Prescod-Caesar's testimony at the May 31st Hearing, was counseled by Coplin and/or Schimmer in the formation of those charges, which included that the support Dr. Shanahan was providing a student and advisee regarding an alleged sexual assault that the student reported to Title IX with Dr. Shanahan's assistance in October 2020, and legal actions the student alleged to be taking related to that alleged assault, violated Denison's policy on reporting sexual misconduct, and constituted a conflict of interest with Denison.

28. Information received a year after this matter commenced suggests not only that the allegations the student made regarding legal actions she was taking connected to her Title IX report were false, but additionally that over the course of years the student made a profound array of other claims and allegations about her life circumstances that were entirely or substantially false.

29. Upon information and belief, and of significant impact to Dr. Shanahan, the student is grossly uncredible, and intentionally and routinely engages in an unspecified type of pathological deception with which she targeted Dr. Shanahan and especially details connected to Dr. Shanahan's history of surviving rape and stalking as a student at Denison.

30. In sum, the person to whom Dr. Shanahan reached out to for support with disability accommodations and a complex Title IX matter—Prescod-Caesar—immediately began threatening Dr. Shanahan with punitive action and then developed bogus charges using Dr.

6

Shanahan's request for accommodations and status as a survivor as one of the primary bases of those charges, as well as culling through information Dr. Shanahan or her counsel provided to explain the extraordinary circumstances she was facing, and which contradicted Denison's threatened charges, and cherry-picking words and phrases to weaponize against Dr. Shanahan.

31. In none of their responses did Prescod-Caesar or Jackson offer Dr. Shanahan third-party support (or a support person) for communication with the Title IX office, specifically, regarding Dr. Shanahan's own Title IX complaint or related matters contained and referenced in Mr. Brescoll's letter, which were directly and causally connected to Dr. Shanahan's disability, and which motivated her request for accommodations.

32. This was despite the fact that Prescod-Caesar, in her capacity as chief human resources officer, was a person listed in Denison's Title IX policy as a university official who can institute corrective measures on behalf of the institution and for whom notice of Title IX violations constitutes Title IX's definition of "actual knowledge" and triggers Denison's obligation under the statute to respond supportively and in a manner that is not deliberately indifference to known circumstances. Dr. Shanahan believes Prescod-Caesar's response was discriminatory and retaliatory; and that she was instructed in this response by Coplin, and/or Schimmer.

33. Additionally, Coplin denied Dr. Shanahan's request to have her counsel present for a meeting, in spite of Coplin also being a person listed in Denison's Title IX policy for whom a Title IX report constitutes "actual knowledge" and therefore triggers Denison's obligation under Title IX to respond supportively.

34. Upon information and belief, in a last ditch effort to persuade Dr. Shanahan to resign, release all legal claims, and promise confidentiality, Schimmer and Jackson (who left Denison two weeks after her final conversations with Dr. Shanahan, at which point Denison

7

provided no alternative Title IX officer who could support Dr. Shanahan) drafted a statement containing fictitious information that Schimmer used in the Hearings to bolster Denison's dubious claims.

35. The President's Advisory Board relied upon the unsigned statement submitted in Jackson's name, without questioning Dr. Shanahan on her truthful version of events and without following up on the evidence Dr. Shanahan provided contradicting Jackson's statement, including that Dr. Shanahan called into question whether Jackson was indeed the author.

36. In its recommendations to the President, the Advisory Board reached the nonsensical conclusion that a primary reason for its recommendation for termination was that Dr. Shanahan would "repeat" the infractions listed in the dubious charges.

37. In reality, Denison's charges were never investigated, the Advisory Board ignored written statements and multiple pieces of evidence Dr. Shanahan provided contradicting those charges, she was not permitted to speak in her defense or answer her attorney's questions; and, on April 19, 2022 (prior to the internal hearings on May 7 and 31, 2022) Dr. Shanahan made a Title IX report, directly contradicting one of Advisory's stated key reasons for recommending termination.

38. During her testimony at the Hearings, Prescod-Caesar admitted having conducted no due diligence prior to bringing charges against Dr. Shanahan.

39. She acknowledged never having asked Dr. Shanahan if she was guilty of the alleged conduct, and could not identify any provisions of Denison's policies that required Dr. Shanahan to do anything other than what she had done.

40. When asked to clarify Denison's bogus and undefined "conflict of interest" charge, Prescod-Caesar stated that Dr. Shanahan's alleged conflict of interest was having PTSD.

8

41. In Dr. Shanahan's written statement in response to Denison's charges, submitted in advance of the Hearings, and which Dr. Shanahan wrote based upon assurances made by Coplin, Schimmer, and Weinberg that she would be permitted to testify at the Hearings, Dr. Shanahan alleged retaliation and misconduct—strictly prohibited in multiple Denison policies, including Title IX—by members of the administration, specifically, but not exclusively, General Counsel Alexandra Schimmer.

42. Among Dr. Shanahan's allegations were complaints regarding Schimmer's inappropriate and unprofessional reference to a wide range of critical comments that were completely unrelated to Dr. Shanahan's disability accommodation requests and that were allegedly held by the Provost.

43. These included Schimmer's informing Mr. Brescoll that Dr. Shanahan would not achieve tenure because the Provost had determined as much (though Dr. Shanahan had just successfully passed pre-tenure review and would not go up for tenure until 2024), gossip by the Provost and members of her staff about a confidential harassment claim Dr. Shanahan filed in May 2021 concerning a colleague's harassment, and dismissive reference to Dr. Shanahan's prior request for Title IX supportive measures in 2019, when Dr. Shanahan was originally diagnosed with PTSD. Schimmer encouraged Mr. Brescoll to convince Dr. Shanahan to consider a "runway" away from Denison, meaning that she should agree to resign because she allegedly had no future at the institution.

44. At the May 7, 2022 Hearing, and in spite of Dr. Shanahan's counsel's repeated objections, Denison pointedly prohibited Mr. Brescoll from testifying about these conversations with Schimmer.

45. Dr. Shanahan believes Schimmer's statements were designed to harm, threaten, and

intimidate her into accepting Denison's separation offer and non-disclosure agreement, and that they reveal a pattern to support her allegation of deliberate indifference.

46. No one at Denison—neither the faculty members of Advisory Board nor President Weinberg, though as Denison employees they are required by Title IX policy to report allegations of retaliation and harassment, nor the executive committee of the board—followed up on Dr. Shanahan's Title IX report or her allegations of the administration's retaliation and misconduct, in spite of evidence that Dr. Shanahan provided which substantiated her claims, and testimony and proffers made at the May 7, 2022 Hearing that supported Dr. Shanahan's allegations.

47. On July 18, 2022 Coplin refused to issue Dr. Shanahan her standard contract for the upcoming 2022-23 academic year, after promising via email on October 8, 2021 that she would receive it at the end of the 2021-22 academic year.

48. On August 10, 2022 Weinberg recommended to the executive committee of Denison's Board of Directors that Dr. Shanahan be suspended from teaching in the fall 2022 semester, and be terminated at the end of that semester.

49. Dr. Shanahan alleges that both Weinberg's recommendation to the executive committee of Denison's Board of Trustees, and the findings of the President's Advisory Board were further acts of disability harassment and retaliation for requesting disability accommodations and for making a Title IX report.

50. On August 26, 2022 Coplin and Weinberg suspended Dr. Shanahan from teaching in the fall 2022 semester, required her to return all university equipment and cut off her access to the university email system, barred her from entering campus, and informed her that she was not to have contact with any Denison student.

51. Also on August 26, 2022, university officials informed Department of

Theatre/Dance Chairperson, Professor Peter Pauzé that Dr. Shanahan was no longer employed at Denison and was not allowed on campus, which Professor Pauzé then repeated to colleagues, even while Denison's outside counsel was attempting to negotiate a separation agreement with Dr. Shanahan that would provide a "soft landing" and the ability for her to say she resigned from Denison.

52. On November 7, 2022 Dr. Shanahan appealed the President's recommendation to the executive committee of Denison University's Board of Trustees.

53. On or about November 10, 2022 the executive committee of Denison's Board of Trustees upheld the President's recommendation that Dr. Shanahan's employment be terminated effective December 31, 2022.

54. The executive committee failed to follow up on or address any of Dr. Shanahan's allegations of Denison's indifference, misconduct, retaliation, and harassment in the handling of her termination

55. On December 29, 2022, one day before Denison submitted its response to Dr. Shanahan's charge filed with the Equal Opportunity Employment Commission, Jackson signed an affidavit containing untrue information regarding Dr. Shanahan, including lies about the nature of her communication with Dr. Shanahan and contradicting evidence Dr. Shanahan provided that reflected the true and accurate nature, timing, and content of their communication. Specifically, Jackson falsely characterized Dr. Shanahan's handling of the student "complaint" addressed above and made numerous defamatory statements about Dr. Shanahan as a survivor of sexual assault.

56. Jackson's affidavit, and the unsigned statement attributed to her for a full year, amounts to Denison's own Title IX Coordinator misrepresenting herself to a member of the faculty seeking guidance and a Title IX Complainant seeking support, and, in turn, writing a false,

derogatory, defamatory, and abusive statement about Dr. Shanahan—again, Dr. Shanahan is a sexual assault survivor and Title IX Complainant that Jackson was required to support, as well as a faculty member seeking guidance—to assist in Denison's attempt to terminate her.

57. Jackson's signed affidavit is similar to, but not identical to, the unsigned statement that Denison previously used in bolstering its claims, which upon information and belief, had been drafted by Schimmer.

58. This suggests that the unsigned statement was amended after-the-fact and reconstituted to submit to the EEOC.

59. On December 30, 2022 Denison University's counsel sent the Jackson affidavit to Dr. Shanahan through her legal counsel, which Dr. Shanahan believes was an effort to intimidate her from taking legal action.

60. In addition, the information from Denison's counsel revealed that Denison's response to Dr. Shanahan's initial EEOC charge intentionally omitted several key documents, which Dr. Shanahan believes was a further effort to intimidate her from pursuing her EEOC Charge.

61. On December 31, 2022 Dr. Shanahan was terminated from her position.

62. That termination was an adverse employment action and as a result of that termination, Dr. Shanahan has suffered damages in an amount in excess of $25,000, the exact amount of which will be proven at trial.

**FIRST CLAIM FOR RELIEF**
**Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.**

63. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

64. The Americans with Disabilities Act, 42. U.S.C. § 12101, *et seq.* prohibits

employment practices that discriminate against persons on the basis of their disabilities.

65. As addressed above, Dr. Shanahan requested a reasonable accommodation based on her disability.

66. Denison's failure to provide these reasonable accommodations, without engaging the interactive process and with virtually no explanation why such an accommodation was unreasonable, is a violation of the ADA.

67. In addition, complaints regarding the failure to provide a reasonable accommodation are considered a "protected activity."

68. Dr. Shanahan's complaints to Denison about its failure to provide reasonable accommodations is a protected activity under the Act and any adverse employment action taken because of such protected speech constitutes prohibited retaliation.

69. For its discrimination and retaliation under the ADA, Denison is liable to Dr. Shanahan in an amount to be determined at trial, plus the equitable remedies of reinstatement and/or front pay.

70. As a direct, legal and proximate result of the discrimination, Dr. Shanahan has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

71. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shanahan's right to be free from discrimination based on disability.

72. Defendant's unlawful actions caused Dr. Shanahan to suffer damages in an amount to be determined at trial.

73. Dr. Shanahan is also entitled to her reasonable attorneys' fees and costs of suit.

## SECOND CLAIM FOR RELIEF
Hostile Work Environment Disability Discrimination and Retaliation Under Ohio Revised Code Chapter 4112

74. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

75. Dr. Shanahan was an "employee" as that term is defined in R.C. 4112.

76. Denison was an "employer" as that term is defined in R.C. 4112.

77. As noted previously, Dr. Shanahan is disabled.

78. Because Dr. Shanahan is disabled, she is a member of a protected class under R.C. 4112.

79. At the time she was discharged she was physically able to perform her duties and otherwise met the requirements of her job and laws pertaining to the relationship between employer and employee.

80. Dr. Shanahan was subjected to the conduct alleged above, including her ultimate termination, due her disability.

81. Dr. Shanahan was subject to the above-described disability discrimination by Denison and its agents at all times pertinent to these allegations.

82. Denison's and its agents' disability discrimination were sufficiently severe and pervasive to adversely affect the terms and conditions of Dr. Shanahan's employment.

83. For its violations of R.C. 4112, Denison is liable to Dr. Shanahan for lost pay and benefits, compensatory and punitive damages, and attorney fees and costs, in an amount to be determined at trial, plus the equitable remedies of reinstatement and/or front pay.

### THIRD CLAIM FOR RELIEF
**Sex-Based Discrimination (Disparate Impact) in Violation of Title VII of the Civil Rights Act of 1964, *as amended*,**
**42 U.S.C. § 2000e-2(a)**

84. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

85. Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their sex.

86. Defendant's and its agents' conduct, as described above, had an adverse and disproportionate impact on Dr. Shanahan because of her sex.

87. As a direct, legal and proximate result of the discrimination, Dr. Shanahan has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

88. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shanahan's right to be free from discrimination based on sex.

89. Defendant's unlawful actions caused Dr. Shanahan to suffer damages in an amount to be determined at trial.

90. Dr. Shanahan is also entitled to his reasonable attorneys' fees and costs of suit.

### FOURTH CLAIM FOR RELIEF
**Hostile Work Environment Gender Discrimination and Retaliation Under Ohio Revised Code Chapter 4112**

91. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

92. Dr. Shanahan was an "employee" as that term is defined in R.C. 4112.

93. Denison was an "employer" as that term is defined in R.C. 4112.

15

94. As noted previously, Dr. Shanahan is female.

95. Because Dr. Shanahan is female, she is a member of a protected class under R.C. 4112.

96. At the time she was discharged she was physically able to perform her duties and otherwise met the requirements of her job and laws pertaining to the relationship between employer and employee.

97. Dr. Shanahan was subjected to the conduct alleged above, including her ultimate termination, due her gender.

98. Dr. Shanahan was subject to the above-described gender discrimination by Denison and its agents at all times pertinent to these allegations.

99. Denison's and its agents' gender discrimination was sufficiently severe and pervasive to adversely affect the terms and conditions of Dr. Shanahan's employment.

100. For its violations of R.C. 4112, Denison is liable to Dr. Shanahan for lost pay and benefits, compensatory and punitive damages, and attorney fees and costs, in an amount to be determined at trial, plus the equitable remedies of reinstatement and/or front pay.

**FIFTH CLAIM FOR RELIEF**
**Violation of Title IX**

101. Plaintiff realleges and restates the facts and allegations above, as if fully rewritten herein.

102. Denison had actual knowledge of detailed, specific, and credible allegations that the school had failed to provide support to Dr. Shanahan as a Title IX Complainant, and failed to follow up appropriately on the Title IX matters she reported.

103. Despite having such actual knowledge, Denison not only failed to respond with adequate investigation, disciplinary action, or remediation efforts, but essentially ignored Dr.

Shanahan's reports.

104. Denison's lack of response to the reports described herein was clearly unreasonable in light of the known circumstances and amounts to deliberate indifference in violation of Title IX.

105. Denison's deliberate indifference to Dr. Shanahan's reports caused her to suffer.

106. Denison finally "investigated," during which it completely ignored all of Dr. Shanahan's evidence, and then proceeded to terminate Dr. Shanahan.

107. Denison's conduct, as described herein, unreasonably interfered with Dr. Shanahan's participation in and enjoyment of the benefits of Denison's educational programs and activities.

108. As a proximate result of Denison's deliberate indifference toward Dr. Shanahan's reports, Dr. Shanahan has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

WHEREFORE, Dr. Shanahan demands the following:

> Lost pay and benefits, compensatory and punitive damages, liquidated damages and attorney fees and costs, in an amount to be determined at trial, plus the equitable remedies of reinstatement and/or front pay.

Respectfully submitted,

DEWITT LAW, LLC

*/s/ Michael W. DeWitt*
Michael W. DeWitt (0066896)
4200 Regent Street
Suite 200
Columbus, Ohio 43219
(614) 398-2886
(614) 750-1379 (facsimile)
mdewitt@dewittlawco.com
*Attorney for Plaintiff*

## JURY DEMAND

Plaintiff demands that a jury decide all claims in this matter that are triable to a jury.

/s/ Michael W. DeWitt
Michael W. DeWitt