**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARY SHANAHAN,**

        **Plaintiff,**

        **v.**

**DENISON UNIVERSITY,**

        **Defendant.**

**Case No. 2:23-cv-2485**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Chelsey M. Vascura**

**OPINION AND ORDER**

This matter is before the Court on Defendant Denison University's Motion for Summary Judgment (ECF No. 23) and Denison's Motion to Strike Affidavit in Opposition to Motion (ECF No. 35). For the reasons stated in this Opinion and Order, the Court **GRANTS** Denison's Motion for Summary Judgment (ECF No. 23) and **DENIES** Denison's Motion to Strike (ECF No. 35).

**BACKGROUND**

This case involves complex discussions around sexual assault, disability, and a web of relationships that culminated in this federal lawsuit against Denison by Plaintiff Mary ("Molly") Shanahan. Ultimately, although the claims raised in this lawsuit relate to serious, troubling, and traumatic experiences in Ms. Shanahan's life, the factual evidence in the record does not support the legal claims and theories advanced in her Complaint. Accordingly, Denison is entitled to summary judgment on all claims.

The Court begins with the relevant background.

**I.**   **Ms. Shanahan's Hiring and Background**

Ms. Shanahan attended Denison University in Granville, Ohio as an undergraduate student from 1986 until 1990. (Shanahan Dep., ECF No. 20-9, 18:20–2; 229:17–21.) She returned to

Denison as a visiting professor of dance in the fall of 2017. (*Id.* at 140:23–141:2.) In August 2017, Ms. Shanahan emailed Steve Gauger, Denison's then-Title IX Coordinator, to report sexual misconduct information disclosed by a student. (*Id.* at 27:10–18; ECF No. 23-20, PageID 1680.) Ms. Shanahan stated that the student "is/was aware that under Title IX I am a mandatory reporter." (ECF No. 23-20, PageID 1680.)

In that same email, Ms. Shanahan explained that she is the victim of a sexual assault and stalking that occurred as part of an abusive dating relationship when she was an undergraduate student at Denison in the 1980s. (*Id.*; *see* Shanahan Dep. at 18:6–22; 154:20–23.) Mr. Gauger replied, stating that there is no time limit on reporting sexual assault and other misconduct and offering to meet to discuss her situation. (ECF No. 23-20, PageID 1679–80.) In November 2017, Ms. Shanahan asked Mr. Gauger what would happen next if she made a Title IX report about her assault and indicated an interest in obtaining a "no-trespass order" regarding her assailant. (ECF No. 23-21, PageID 1683–85.) The two arranged to meet to discuss the matter. (*Id.*)

In later emails, Mr. Gauger explained various support resources available to Ms. Shanahan. (ECF No. 23-23; ECF No. 23-24.) He also stated that, based on the information Ms. Shanahan told him that he then provided to the Granville Police Department, the police asked Mr. Gauger to file a formal report about the assault. (ECF No. 23-22.) After consulting with Ms. Shanahan, Mr. Gauger filed a police report. (ECF No. 23-22; Shanahan Dep. at 160:2–161:4.) Ms. Shanahan states that at some point she filed a Title IX complaint with Mr. Gauger, but she does not clarify whether the above emails constituted the report or whether she made a separate, formal report. (Compl., ECF No. 1, ¶ 12.)

Ms. Shanahan continued her work as an assistant professor for two years, and she accepted an expedited tenure-track position in April 2019. (Shanahan Dep., 176:13–177:16; 194:24–195:8.)

2

In early 2019, Ms. Shanahan learned that her assailant, John Doe, had a daughter who was a current student attending Denison when the daughter initially enrolled in one of Ms. Shanahan's classes (though the student dropped the class before appearing). (Shanahan Dep., 26:25–28:16; 149:2–10.) This incident triggered a trauma response in Ms. Shanahan, and she reported her concern to Denison administrators. (*Id.* at 27:19–28:16.) Ms. Shanahan sought counseling, and a licensed counselor diagnosed her with post-traumatic stress disorder ("PTSD") in January 2019. (*Id.* at 26:9–27:9; 74:12–17.) She disclosed her PTSD diagnosis to Alison Williams, Denison's Associate Provost, in January or February 2019 but did not request any assistance related to it at the time. (*Id.* at 86:20–88:22.)

With the assistance of Mr. Gauger, Ms. Shanahan sent John Doe a "no-contact request" in January 2019 in which Ms. Shanahan informed John Doe that she worked at Denison and asked him not to contact her. (*Id.* at 36:1–38:17.) She testified that Mr. Gauger told her that Denison would enforce the request. (*Id.* 37:7–38:4.)

## II.     Initial Contact with "Student A"

In October 2020, Ms. Shanahan emailed Stephanie Jackson, Denison's then-Title IX Coordinator, "about a student whose name I promised to keep anonymous." (ECF No. 23-4, PageID 1479.) Ms. Shanahan stated that the student, "Student A," reported to Ms. Shanahan that she "experienced a violation of sexual boundaries" but did not want to file a Title IX claim. (*Id.*) In response, Ms. Jackson asked Ms. Shanahan to identify Student A, stated that she would reach out to Student A to discuss her situation, and provided information about Title IX reporting procedures and next steps. (*Id.* PageID 1478–79.) Ms. Shanahan responded that she believed Student A was planning to contact Ms. Jackson, but she did not provide Student A's name. (*Id.* PageID 1477.)

According to Ms. Shanahan, when Student A approached her about Student A's situation in October 2020, Ms. Shanahan informed Student A that she was a "mandatory reporter." (Shanahan Dep. at 94:22–95:4.) During a second conversation with Student A later that month, Student A disclosed more details, including that a male student made her uncomfortable through sexual advances, and stated that she approved of Ms. Shanahan contacting Ms. Jackson about the situation. (*Id.* at 101:23–103:17.) Ms. Shanahan testified that she was concerned Student A had been sexually assaulted and that it was Ms. Shanahan's own decision to not disclose Student A's name to Ms. Jackson. (*Id.* at 180:5–182:15.)

Ms. Jackson stated that Ms. Shanahan informed her that Ms. Shanahan was working "confidentially" with Student A. (Jackson Aff., ECF No. 23-3, ¶ 17; Jackson Dep., ECF No. 20-5, 42:18–44:25.) Ms. Jackson testified that she repeatedly advised Ms. Shanahan that she was a mandatory reporter and that she was "required to promptly report all information she has about potential sexual assault or other misconduct under Denison's policy, and regardless of her beliefs about whether the matter had otherwise been reported." (*Id.* at 55:18–56:4.) She told Ms. Shanahan that she was not a confidential resource and that it was improper for her to represent herself as one. (Jackson Aff. at ¶ 40.)

Denison learned of Student A's identity when Student A herself contacted Denison's Title IX Office approximately two weeks after Ms. Shanahan contacted Ms. Jackson about her. (Jackson Dep. at 44:8–17.) Student A informed Ms. Jackson that she had been raped, but she did not state the identity of her assailant. (Jackson Aff. at ¶ 30.) She declined to pursue a formal Title IX complaint, and Ms. Jackson informed her about support resources available through Denison. (*Id.*) Ms. Jackson reported the situation to the Granville Police Department. (Jackson Dep. at 64:4–12.)

### III.    The Brescoll Email and Additional Developments

On November 8, 2021, an attorney named Dan Brescoll emailed Ms. Prescod-Caesar, Denison's Associate Vice President for Human Resources, "on behalf of" his personal friend, Ms. Shanahan. (Brescoll Email, ECF No. 23-5, PageID 1493–94.) He stated that a student, later known by Denison to be Student A, "has recently been the victim of multiple sexual and physical assaults, as well as retaliatory stalking, at the hands of other Denison students." (*Id.* at PageID 1493; Jackson Aff. at ¶ 41.) He further stated,

> Molly [Ms. Shanahan] has gladly made herself available to this student as a safe (and confidential) space and source of support. However, as this situation has escalated, doing so has taken up an increasingly significant amount of Molly's time and emotional bandwidth, especially given Molly's own history as a victim of sexual assault who suffers from PTSD as a result of her trauma. Moreover, the attacks on this student, which would potentially be triggering for Molly in any event, have been infinitely more so given that Molly was also sexually assaulted as an undergraduate at Denison and, in fact, was assaulted by the father of the alleged primary assailant against this student.

(Brecoll Email, PageID 1493.) According to Ms. Prescod-Caesar, the Brescoll Email was the first time Denison learned that Ms. Shanahan believed she knew the identity of Student A's assailant. (ECF No. 23-9, PageID 1537.) Simultaneously, Denison learned that Ms. Shanahan believed that Student A's assailant was the son of her own assailant from the 1980s, who had both a daughter and a son attending Denison at the time. (*Id.*)

Later in the email, Mr. Brescoll added:

> Recently, Molly has come to realize, in close consultation with her therapist and with her doctor, that, in order to continue the important work of supporting this student, while maintaining her own mental health and continuing to teach at the high level she expects of herself, she needs to make the University's administration formally aware of this situation and the unexpected, significant and often urgent demands on her time and energy it has required of her, and to seek support from the University in the following ways:
>
> 1. To be formally relieved of any administrative work or other work duties that are not directly related to Molly's current course load, including any search committee

responsibilities, for the balance of the semester; and

2. To establish an intermediary (me) for any and all communications between the University's administration and Molly, whether they concern this student's situation as it works its way through the criminal justice system or involve any other matters that do not directly relate to the courses Molly is teaching this semester.

(Brescoll Email, PageID 1493.)

The next day, Ms. Prescod-Caesar emailed Ms. Shanahan directly, informing her that it is "Denison's policy to communicate directly with our faculty and staff." (Prescod-Caesar Email, ECF No. 23-5, PageID 1495–96.) She directed Ms. Shanahan to "right away report the student sexual assault information" to Ms. Jackson and instructed Ms. Shanahan that she was "required to report" all information about sexual misconduct under Denison's Sex Discrimination and Sexual Misconduct Policy. (*Id.* at PageID 1495; *see* Policy, ECF No. 23-1.) Ms. Prescod-Caesar stated that "[i]t is not within a faculty member's role to be providing sexual assault support services to students to the extent Mr. Brescoll's email suggests you are doing" and that "Denison does not grant faculty members work releases from other faculty responsibilities to play that role." (Prescod-Caesar Email, PageID 1495.)

Last, Ms. Prescod-Caesar informed Ms. Shanahan that "it is critical that you not entangle yourself in this matter further" given the "personal conflict" identified in Mr. Brescoll's email and that ceasing her activity with the student "should relieve the demands on your time and energy attributed by Mr. Brescoll to that student matter." (*Id.*) She offered to speak with Ms. Shanahan further about the matter, including the requests in the Brescoll Email. (*Id.*)

On a November 10, 2021 call, Ms. Shanahan informed Ms. Jackson that in the spring semester of 2021 (approximately six months before the Brescoll Email), she learned more details about Student A's alleged assault, including the identity of her alleged assailant. (ECF No. 20-6, PageID 221–22; Jackson Dep. at 61:7–19.) Ms. Shanahan later testified that, through the Brescoll

6

Email, she was "reporting a profound challenge related to the potential connection between the alleged assault—assailants," and that she did not make a new Title IX report in her November 10 conversation with Ms. Jackson. (Shanahan Dep. at 299:3–300:11.)

The next day, November 11, Ms. Prescod-Caesar asked Ms. Shanahan to confirm she understood that she was no longer to engage with Student A and informed her that Denison was assessing whether she violated its policy that faculty are to report "all information" regarding sexual misconduct. (ECF No. 23-9, PageID 1537.) She further stated,

> The information shared by Mr. Brescoll in his email and that you shared with Stephanie Jackson . . . suggests that for months, you have possessed material information (including the identity of an alleged respondent and information about new and different conduct) that you did not previously disclose with the University, but that was required to have been shared under the policy.

(*Id.*) Ms. Shanahan responded later that day, stating "[c]onfirmed and understood." (*Id.*)

## IV.    Denison's Mandatory Reporting Policy

Ms. Shanahan understood herself to be bound to follow all of Denison's policies, including Denison's Sex Discrimination and Sexual Misconduct Policy. (Shanahan Dep. at 123:16–25.) Under that policy, all faculty are subject to the following "reporting requirements": "Denison employees, who are not confidential resources, who become aware of behavior that may constitute Prohibited Conduct should report all information regarding such Prohibited Conduct to the Title IX Coordinator or Deputy Title IX Coordinators as soon as reasonably possible." (Policy, PageID 1437.) An appendix (titled "On-campus and Off-campus Resources") attached to the Policy and repeatedly referenced by it states that "per Title IX regulations and this Policy, [faculty members] are required to report all instances of sexual assault and other sexual misconduct, intimate partner violence or stalking." (ECF No. 23-1, PageID 1461.)

Ms. Shanahan attended Title IX orientation sessions in August 2017 and in August 2019

at which Denison officials reviewed the misconduct policy. (Shanahan Dep. at 123:3–20.) She testified that she understood herself to be a "mandatory reporter" (and not a "confidential resource") under the policy throughout her time on the faculty at Denison. (*Id.* at 58:4–24; 66:9–67:5; 71:21–73:18; 132:5–15.)

## V. Disciplinary Proceedings

Denison offered Ms. Shanahan a mutual separation agreement on November 11, 2021, as an alternative to initiating formal disciplinary proceedings. (Brescoll Dep., ECF No. 20-1, 58:19–24; 60:14–19.) Ms. Shanahan rejected the offer through Mr. Brescoll. (Shanahan Dep. at 348:14–350:21.) On November 30, 2021, Ms. Shanahan met with Denison's Provost Kim Coplin, who informed her that the mutual separation agreement offer was still open. (*Id.* at 345:10–346:16.) Ms. Shanahan opted to participate in formal disciplinary proceedings. (*Id.* at 348:14–350:21.)

Denison initiated formal disciplinary proceedings on January 17, 2021 through the Denison President's Advisory Board, comprised of six Denison faculty members. (ECF No. 23-13, PageID 1581–82.) That day, Ms. Shanahan received a notice letter from Denson's President, Adam Weinberg, informing her that Denison believed she "committed repeated serious violations of the sexual misconduct reporting requirement." (ECF No. 23-5, PageID 1497.) He provided the relevant information forming the basis of the investigation and informed her of her rights under Denison's Faculty Handbook. (*Id.* at PageID 1498.)

On behalf of Denison's Office of Human Resources, Ms. Prescod-Caesar presented the Advisory Board with a Statement of Charges against Ms. Shanahan, charging her with "professional incompetence and non-performance." (ECF No. 23-5, PageID 1484–92.) Ms. Shanahan sent the Board a 64-page response to the Statement of Charges. (ECF No. 20-12, PageID 751–814.) She titled the response "Choosing Betrayal or Courage: Institutionalized Rape Culture

8

and DARVO [deny, attack, reverse victim and offender] at Denison University." (*Id.* PageID 752) It opens with a summary, stating in part, "Denison is weaponizing sensitive information, which I shared in a request to HR for disability accommodations, in an attempt to intimidate, discredit, and now terminate me." (*Id.*) She explained the timeline of events, including how she came to believe that Student A's assailant was the son of her own attacker. (*Id.* PageID 777–78.) The Advisory Board held a hearing on May 7, 2022, at which it considered Ms. Shanahan's response, and it permitted Ms. Shanahan to cross-examine Ms. Prescod-Caesar at a later date. (ECF No. 23-6, PageID 1519.) Ms. Shanahan was represented by counsel throughout the disciplinary proceedings. (Shanahan Dep. at 354:7–356:11.)

On August 3, 2022, the Advisory Board presented their report and recommendations to President Weinberg. (ECF Nos. 23-6, 23-14.) The Board concluded that Ms. Shanahan "repeatedly failed to comply with mandatory reporting obligations to promptly report all information about incidents of sexual assault or other misconduct that violated [Denison's] Policy." (ECF No. 23-6, PageID 1521.) The Advisory Board's recommendation was based solely on Ms. Shanahan's conduct in the spring semester of 2021 through the fall of 2021. (*Id.* at PageID 1522.) It found that Ms. Shanahan received information from Student A that was subject to mandatory reporting and was not reported, misrepresented herself to Student A as a confidential resource, misled Denison about her knowledge of the situation, inappropriately requested relief from responsibilities that were specifically prohibited, and "unprofessionally continued her involvement" in the matter after she started to believe that Student A's assailant was the son of her own assailant. (*Id.* at PageID 1522–28.) Accordingly, the Board stated it would not oppose Denison if it chose to terminate Ms. Shanahan's employment. (*Id.* at PageID 1528.)

President Weinberg adopted the Advisory Board's findings and recommendations on

August 11, 2022, and recommended termination of Ms. Shanahan's employment to Denison's Executive Committee of Trustees. (ECF No. 23-7, PageID 1530–31.) Ms. Shanahan appeared before the Executive Committee and delivered a 30-minute statement in her defense. (Shanahan Dep. at 387:9–389:3.) The Committee agreed with the recommendation, and Denison terminated her employment. (*Id.* at 392:6–14.)

## VI.    Procedural History

Ms. Shanahan brought this lawsuit against Denison in August 2023. (ECF No. 1.) She names five claims against Denison in the Complaint, but seven types of claims are expressly raised among those claims: (1) disability discrimination by failure to accommodate, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; (2) "hostile work environment disability discrimination," in violation of Ohio law; (3) retaliation for disability-based protected conduct under Ohio law; (4) gender discrimination based on disparate impact, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*; (5) "hostile work environment gender discrimination," in violation of Ohio law; (6) retaliation for gender-based protected conduct, in violation of Ohio law; and (7) a violation of Title IX of the Education Amendments of 1972. (Compl., ¶¶ 63–108.)

Denison moved for summary judgment. (ECF No. 23.) Ms. Shanahan filed a Response in opposition. (ECF No. 30.) Ten days later, and six days before Denison's deadline to file a reply brief, Ms. Shanahan filed a 64-page, 200-paragraph sworn Declaration in support of her Response in which she directly responds to many of the facts and arguments raised in Denison's Motion for Summary Judgment. (Shanahan Decl., ECF No. 31.) Attached to her Declaration, she filed 82 exhibits totaling over 670 pages. (ECF Nos. 31-1–31-80.) The Court extended Denison's reply brief date by eight days until November 12, 2024. (ECF No. 33.)

On November 12, Denison filed its Reply (Reply, ECF No. 34) and a Motion to Strike Ms. Shanahan's Declaration and the attached exhibits (Mot. to Strike, ECF No. 35). Ms. Shanahan responded in opposition to the Motion to Strike. (ECF No. 40.) Denison filed a reply in support of its Motion to Strike. (ECF No. 41.)

As the Court addresses later in the Analysis section, Ms. Shanahan abandons her hostile work environment claims in her Response. But in the Complaint and in her Response, she alleges disability discrimination and gender discrimination claims more generally under Ohio law. The Court construes Ms. Shanahan as raising and advancing the following claims: (1) failure to accommodate under the ADA, (2) disability discrimination under Ohio law, (3) gender discrimination under Ohio law, (4) disability-based retaliation under Ohio law, (5) gender-based retaliation under Ohio law, (6) disparate impact sex discrimination in violation of Title VII, and (7) a violation of Title IX.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

11

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## ANALYSIS

The Court first addresses Denison's Motion to Strike the new Declaration and exhibits filed by Ms. Shanahan after she filed her Response. The Court then addresses Denison's Motion for Summary Judgment as to each of Ms. Shanahan's claims, as construed by the Court.

### I.  Denison's Motion to Strike

Denison asks the Court to strike Ms. Shanahan's 200-paragraph, 64-page Declaration and 82 exhibits consisting of 672 pages attached to the Declaration, arguing the documents were filed after the close of discovery, without leave of Court, and in violation of Rule 56 of the Federal Rules of Civil Procedure. (Mot. to Strike, PageID 2602–03.) Denison argues that the documents contain statements not based on personal knowledge, improper legal arguments and conclusions, and contradictions of prior testimony. (*Id.*) It also argues Ms. Shanahan failed to produce many of the exhibits during discovery and that the exhibits are all unauthenticated, in violation of Rule 56(e). (*Id.* at PageID 2605–06.) Last, it argues the filings violate Rule 56(c) and 6(c)(2) of the Federal Rules of Civil Procedure and Southern District of Ohio Civil Rule 7.2(e) because the documents were filed separate from (and ten days later than) Ms. Shanahan's Response.

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The determination of whether to strike a filing rests within the sound discretion of the Court. *See Wausau Benefits v. Progressive Ins. Co.*, 270 F. Supp. 2d 980, 985 (S.D. Ohio 2003) (King, M.J.). Motions to strike are generally disfavored and considered remedies that "should be sparingly used by the courts." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

The Court will not take the drastic measure of striking all of Ms. Shanahan's filings, for several reasons. First, to the extent the assertions in her Declaration are not based on personal knowledge, provide improper legal conclusions, or contradict her prior testimony, the Court will disregard such statements and arguments if they become relevant.

Second, the Court recognizes Denison's concern over new information disclosed after the close of discovery and just days before Denison's Reply was due without explanation and without leave of Court. By the Court's count, Ms. Shanahan only references about 30 of the 82 attached exhibits in her Response, raising questions about the relevance and purpose of the other 50 or so exhibits and straining against this Court's local rules. *See* S.D. Ohio Civ. R. 7.2(e) ("Evidence submitted, including discovery documents, shall be limited to that necessary for decision and shall include only essential portions of transcripts or exhibits referenced in the memorandum.") Even so, the Court granted Denison an eight-day extension to file its Reply brief after the exhibits were filed, and the Court is confident that Denison's concerns about the new evidence were adequately addressed in the Motion to Strike and in the Reply.

Third, as discussed below, Denison is still entitled to summary judgment on all counts even if the Court considers Ms. Shanahan's references to the new evidence in her Response brief. Thus, in line with the Court's preference to resolve cases on the merits, the Court will not altogether

strike the Declaration and exhibits. Denison's Motion to Strike is **DENIED**.

## II. Disability Discrimination Under the ADA

The Court now addresses Denison's Motion for Summary Judgment, starting with Ms. Shanahan's failure to accommodate claim under the ADA.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Ms. Shanahan's disability discrimination claim under the ADA is premised on Denison's alleged failure to offer a reasonable accommodation. Because reasonable accommodation claims "necessarily involve direct evidence (the failure to accommodate) of discrimination," the Court "jettison[s] the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases (also called 'circumstantial-evidence cases')." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

Instead, for reasonable accommodation claims, the plaintiff bears the burden that "(1) she is disabled; and (2) she is 'otherwise qualified for the position despite' her disability, either with or without a reasonable accommodation." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (quoting *Kleiber*, 485 F.3d at 869). "An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not." *Id.* (citing 42 U.S.C. § 12111(8)). If the plaintiff meets that burden, the employer will then "bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Kleiber*, 485 F.3d at 869 (quotation omitted).

14

### A.  Accommodation Request

Denison argues Ms. Shanahan's reasonable accommodation claim fails because she never requested a reasonable accommodation. (ECF No. 23, PageID 1395.) Ms. Shanahan argues the November 8, 2021 Brescoll Email was a request for a disability accommodation. (ECF No. 30, PageID 1825.) On behalf of Ms. Shanahan, Mr. Brescoll asked Denison to formally relieve Ms. Shanahan of "any administrative work or other work duties that are not directly related to Molly's current course load," and to establish him as an intermediary for "any and all communications" between Ms. Shanahan and Denison not related to course work. (Brescoll Email, PageID 1493.)

Certainly, a "reasonable accommodation is not at issue if the plaintiff has never requested accommodations." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 n.4 (6th Cir. 1998). A reasonable accommodation may include "job restructuring, part-time or modified work schedules, . . . and other similar accommodations." 42 U.S.C. § 12111(9)(B). To determine whether an employee made an accommodation request, courts can consider whether the request is causally connected to the disability, whether the employee explained that the accommodation is needed because of the disability, and whether the employee requested specific accommodations. *See Stanciel v. Donahoe*, 570 F. App'x 578, 583–84 (6th Cir. 2014).

Ultimately, the record shows that the requests in the Brescoll Email were not causally related to Ms. Shanahan's PTSD. The email was not characterized as a disability accommodations request in the email itself or in follow up conversations about it. To the extent Ms. Shanahan requested accommodations, those requests were to accommodate her relationship with Student A, not to accommodate her PTSD.

The Brescoll Email focused on how Ms. Shanahan's role "as a safe (and confidential) space and source of support" for Student A took up Ms. Shanahan's "time and emotional bandwith."

(Brescoll Email, PageID 1493.) Her PTSD was mentioned only as an ancillary factor for why her relationship with Student A was so taxing on Ms. Shanahan. Furthermore, the email stated Ms. Shanahan needed the requested changes "to continue the important work of supporting [Student A], while maintaining her own mental health and continuing to teach at the high level she expects of herself." (Brescoll Email, PageID 1493.) The email did not elaborate on why Ms. Shanahan's PTSD requires relief from her administrative responsibilities. Mr. Brescoll testified that in three follow up calls with Denison's general counsel, Mr. Brescoll never reiterated or discussed any disability accommodation request (because, he testified, Denison's investigation into Ms. Shanahan "superseded" those concerns). (Brescoll Dep., 63:5–13.)

Additionally, Ms, Shanahan declined several opportunities to clarify that the email was a disability accommodation request or to make a separate accommodation request. In response to the Brescoll Email, Ms. Prescod-Caesar stated to Ms. Shanahan that she should not continue "providing sexual assault support services" to Student A because that "is not within a faculty member's role" and because of her personal conflict regarding Student A's alleged assailant. (ECF No. 23-9, PageID 1538.) Ms. Prescod-Caesar stated that compliance with those instructions "should relieve the demands on your time and energy" that were identified in the Brescoll Email. (*Id.*) In response, Ms. Shanahan stated, "[c]onfirmed and understood," and did not raise that her requests were related to her PTSD rather than to counseling Student A. (*Id.* PageID 1537.)

Ms. Shanahan eventually characterized the Brescoll Email as a disability accommodation request to Ms. Prescod-Caesar in January 2022. (ECF No. 23-8, ¶ 11.) In response, Ms. Prescod-Caesar informed Ms. Shanahan on January 20, 2022, that Denison did not view the Brescoll Email as a disability accommodation request and explained that Ms. Shanahan declined Ms. Prescod-Caesar's invitation to further discuss Denison's response to the Brescoll Email. (ECF No. 23-12,

16

PageID 1565–66.) Ms. Shanahan did not follow up to correct that understanding or to make a separate accommodation request. (ECF No. 23-8, ¶ 11.) Ms. Shanahan also did not raise her disability in conversations with Ms. Jackson. (*See* ECF Nos. 23-10, 23-11.)

Last, Ms. Shanahan and Mr. Brescoll both agreed in depositions that requests in the email were not causally related to her PTSD. When asked to confirm that the email did not indicate that she needed "any type of accommodation for your PTSD because you can't perform the duties of your job," Ms. Shanahan responded, "Correct." (Shanahan Dep., 244:18–22.) When asked whether the email informed Denison "of any specific functions of [Ms. Shanahan's] position as a faculty member that she could not perform because of her PTSD," Mr. Brescoll stated, "I think the connection you're trying to make between the PTSD and a specific function was not part of our discussion or part of this request." (Brescoll Dep., 35:2–11.) He also agreed that the email did not reference any specific job duties that Ms. Shanahan could not perform "because of her PTSD." (*Id.* at 35:12–15.)

Accordingly, there is no genuine issue of material fact about whether the Brescoll Email constituted a disability accommodations request, so Denison is entitled to summary judgment on her failure to accommodate claim. *See Stanciel,* 570 F. App'x at 584.

### B. Reasonableness of the Request

Even if the Court construed the Brescoll Email as a disability accommodations request, the request was unreasonable because Ms. Shanahan sought relief from her essential job duties for the purpose of performing an activity outside her job duties and against Denison policy. "[I]t is the plaintiff's duty to propose an accommodation that is objectively reasonable to employers generally." *Wardia v. Just. & Pub. Safety Cabinet Dep't of Juv. Just.*, 509 F. App'x 527, 531 (6th Cir. 2013). "[R]equested accommodations are reasonable only if they 'address a key obstacle

17

preventing [the employee] from performing a necessary function of [her job.]'" *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)).

Here, Ms. Shanahan sought relief from all of her administrative duties so that she could "continue the important work of supporting this student," which included acting as a "confidential" resource. (Brescoll Email, PageID 1493.) This presents an obvious problem: the characterization cuts against Denison's policy that its faculty members like Ms. Shanahan "are not confidential resources." (Policy, PageID 1437.) But second, even assuming Ms. Shanahan sought to support Student A in a way that tracked her normal duties as a faculty member, her request to be relieved of all her administrative duties so that she may perform services otherwise prohibited by the University is an unreasonable request.

Accordingly, the Court finds that even if the Brescoll Email contained a disability accommodation request, the request was not a reasonable one. Ms. Shanahan's failure to accommodate claim fails on that additional, independent ground.

### III.    Hostile Work Environment

In the Complaint, Ms. Shanahan brings a "hostile work environment disability discrimination and retaliation" claim under state law. (Compl., ¶¶ 74–83.) She claims she faced disability discrimination "sufficiently severe and pervasive to adversely affect the terms and conditions" of her employment—a description that recites necessary elements of a hostile work environment claim. (*Id.* ¶ 82); *see Rodenbeck v. Nationwide Ins.*, No. 2:19-CV-204, 2020 WL 2306580, at *9 (S.D. Ohio May 8, 2020) ("To prevail [on a hostile work environment claim based on disability], the plaintiff must prove 'conduct that is sufficiently severe or pervasive to alter the conditions to [of his] employment and [to] create an abusive working environment.'" (quoting

*Trepka v. Bd. of the Cleveland City Sch. Dist.*, 28 F. App'x 455, 461 (6th Cir. 2002))). She also nominally brings a "hostile work environment gender discrimination and retaliation" claim under state law with similar language. (Compl., ¶¶ 91–100.)

In her response to Denison's Motion for Summary Judgment, Ms. Shanahan recasts the claims as more generalized disability discrimination and gender discrimination claims under Ohio law and does not argue to the hostile work environment standard for either. (Resp., PageID 1826–27.) Furthermore, she does not respond to Denison's arguments that she has not met the hostile work environment standard, and she cites to no evidence in the record to support her nominal hostile work environment claims. (*Id.* PageID 1826–28.) Accordingly, Ms. Shanahan has waived her hostile work environment claims, and Denison is entitled to summary judgment on them. *See Haddad v. Sec'y, U.S. Dept. of Homeland Sec.*, 610 Fed.Appx. 567, 568–69 (6th Cir. 2015) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived." (quoting *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013))).

## IV. Disability and Gender Discrimination Under Ohio Law

Without acknowledging the "hostile work environment" title and focus of her disability discrimination and gender discrimination claims, Ms. Shanahan argues that genuine issues of material facts remain regarding whether Denison discriminated against her based on her disability and based on her gender. (Resp., PageID 1826–28.) She states the standard for both types of discrimination claims in her Response, even though those claims were not specifically identified as such in the Complaint. (*Id.*) Denison argues the disability discrimination and gender discrimination claims were not properly raised and that the Court should not entertain them. (Reply, PageID 2588–89, 2594–95.)

Although Ms. Shanahan could have more clearly identified her claims, she sufficiently

asserts disability discrimination and gender discrimination in her Complaint. She alleges that Denison terminated her employment "due to her disability" and "due to her gender." (Compl., ¶¶ 80, 97.) The Court construes the Complaint as raising disability-based discrimination and gender-based discrimination claims under Ohio law. The Court also considers Ms. Shanahan's defense of the claims in the Response and Denison's arguments for summary judgment on those claims in the Reply.

### A. Disability Discrimination Claim

Federal courts generally apply the same analysis for Ohio law disability discrimination claims as they apply for claims under the ADA. *Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010). Ms. Shanahan does not identify any direct evidence of discrimination in her termination other than the Brescoll Email, which this Court held above did not constitute a disability accommodation request. (*See* Resp.) Accordingly, the Court analyzes her claim under the *McDonnell Douglas* burden shifting framework for discrimination claims based on indirect evidence. *See A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To set forth a prima facie case of ADA discrimination (and therefore under Ohio law), a plaintiff must show that "1) she is an individual with a disability [or is regarded as such]; 2) she is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and 3) she suffered an adverse employment action because of her disability." *Barnum v. Ohio State Univ. Med Ctr.*, 642 F. App'x. 525, 532 (6th Cir. 2016) (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999)). "Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir.

2008) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). The Defendant's burden "is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley*, 542 F.3d at 1105.

### i. Nondiscriminatory Reason for Termination

The Court need not address whether Ms. Shanahan has established a prima facie case of disability discrimination because, assuming she did, Denison has met its burden of articulating a legitimate nondiscriminatory reason for terminating Ms. Shanahan's employment. Denison's faculty Advisory Board found that Ms. Shanahan "repeatedly failed to comply with mandatory reporting obligations to promptly report all information about incidents of sexual assault or other misconduct." (ECF No. 23-6, PageID 1521.) It also found that Ms. Shanahan misrepresented herself as a confidential resource to Student A, failed to report multiple disclosures from Student A across several months that triggered Ms. Shanahan's reporting duties under the Faculty Handbook, misled Denison about her knowledge of Student A's situation and her representations to Student A, and failed to meet Denison's standards of professionalism. (*Id.* PageID 1521–27.)

Denison's evidence of Ms. Shanahan's multiple policy violations supports that it terminated Ms. Shanahan's employment for legitimate, nondiscriminatory reasons. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 252 (6th Cir. 2023) ("We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment.") The burden thus shifts to Ms. Shanahan to show pretext.

### ii. Pretext

"To establish pretext, the employee must show 'that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 569 (6th Cir. 2023) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

Ms. Shanahan levies serious accusations about Denison's true reason for terminating her employment, alleging that "Denison concocted a scheme to make it appear that Dr. Shanahan had violated a Denison policy" and engaged in "gaslighting" and a "deliberate misinformation campaign." (Resp., PageID 1800, 1819.) But she does not support those assertions with evidence in the record beyond her own Declaration.

Her conclusory argument that Denison terminated her "based solely on her disability when it learned that assisting Student A had triggered [her] PTSD" is unpersuasive, especially considering that she first informed Denison of her PTSD nearly two years before Denison initiated any adverse action regarding her employment. Ms. Shanahan disclosed her PTSD in early 2019, long before Mr. Brescoll mentioned her PTSD in his email to Denison requesting accommodations due to her relationship with Student A. (Shanahan Dep., 82:20–88:22, 91:11–14.) Denison's long-standing knowledge of Ms. Shanahan's disability lessens any inference of disability discrimination arising from the single reference to it in the Brescoll Email. *See Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011) (holding that the employer's years-long awareness of the disability in question "undercuts the inference" of discrimination). Ms. Shanahan cites no other evidence in the record to support the argument that Denison's true reason for terminating her was her PTSD.

Ms. Shanahan also refutes Denison's conclusion that she failed to meet mandatory

reporting obligations. (Resp., PageID 1803–10, 1826.) But she testified that Denison's sexual misconduct policy did not exempt reporting of a victim's name, and she understood that she was not to act as a confidential resource under the policy. (Shanahan Dep. at 71:21–73:18; 179:25–180:4.) Regardless, the Advisory Board's reasoning for her termination extends beyond the mandatory reporting policy—it also found that she misled Denison about her communications with Student A and failed to meet professional conduct standards.

Alternatively, she argues that Denison's mandatory reporting policy is not "mandatory," and that it was "confusing" because the Policy states that faculty members "*should* report all information regarding" potential sexual misconduct. (Policy, PageID 1437 (emphasis added); *see* Resp., PageID 1802–03, 1806.) But from the start of her time on the faculty at Denison in 2017 through her deposition for this lawsuit, she repeatedly acknowledged her status as a "mandatory reporter" under Denison's sexual misconduct policy. (*See* ECF No. 23-20, PageID 1680; Shanahan Dep. at 58:4–24; 66:9–67:5; 71:21–73:18; 132:5–15.) And Ms. Shanahan does not dispute Ms. Jackson's testimony that in October 2020, Ms. Jackson reiterated those mandatory reporting obligations to Ms. Shanahan after she contacted Ms. Jackson about Student A. That reminder and reiteration of the Policy preceded Ms. Shanahan's Policy violations that led to her termination.

The Advisory Board considered and rejected Ms. Shanahan's argument that the Policy was not mandatory after reviewing Ms. Shanahan's faculty training, the full context of the Policy, and an appendix to the Policy that states "per Title IX regulations and this Policy, [faculty members] are *required* to report all instances of sexual assault and other sexual misconduct, intimate partner violence or stalking." (ECF No. 23-6, PageID 1521 (emphasis added).) In light of this evidence and the above discussion, there is no genuine issue of material fact regarding whether Ms. Shanahan was a mandatory reporter under Denison's employment policies.

In short, Ms. Shanahan failed to meet her burden to demonstrate that Denison's reasons for terminating her employment was pretext for discrimination based on her PTSD.

### iii. Denison's Reasonable Reliance

Even if Ms. Shanahan presented evidence that Denison was wrong about her violating Denison's employment policies, she would not overcome Denison's reasonable reliance on the evidence of her policy violations. An employer may avoid a finding of pretext if it demonstrates that, even though its proffered reason for adverse action was mistaken, "the employer made a reasonably informed and considered decision before taking an adverse employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

The faculty Advisory Board's findings were reasonable in light of the evidence before it, which included Ms. Shanahan's arguments in opposition. It knew that Ms. Shanahan notified Denison on October 17, 2020 about a student who "experienced a violation of sexual boundaries" and that Ms. Shanahan refused to give the student's name when asked. (ECF No. 23-4, PageID 1478–79.) Ms. Shanahan argues she met her obligations at that time, but the Advisory Board based its findings about policy violations that occurred later, in 2021. (ECF No. 23-6, PageID 1522.) As discussed above, the Board found that she repeatedly and continuously failed to report information about Student A's situation in violation of Denison policy throughout 2021. (*Id.* PageID 1523.) In response, Ms. Shanahan argues that a review of her full testimony shows that she navigated the "nuanced and often confusing nature of responding to student disclosures" within Denison policy. (Resp., PageID 1806.)

Ms. Shanahan explains that she inferred the identity of Student A's alleged assailant, advised Student A to seek a no contact order with him, and repeatedly received "complaints" from

Student A in 2021 that she was "struggling" with various "maladies." (*Id.* PageID 1807.) She does not assert that these "complaints" related to something other than sexual assault or that she was not obligated to report the repeated disclosures by Student A. Rather, Ms. Shanahan states that she "did not recontact the Title IX office about Student A" to report these developments because she believed Denison was already aware of the situation. (*Id.*) Furthermore, the Board weighed the Brescoll Email, which revealed that Ms. Shanahan knew more information than what she had disclosed, including "multiple sexual and physical assaults, as well as retaliatory stalking" against Student A and the identity of Student A's alleged assailant. (ECF No. 23-6, PageID 1523.)

Even with the benefit of extra time to develop the record since Denison's disciplinary process, Ms. Shanahan does not produce evidence that undermines the Advisory Board's findings that she violated Denison's mandatory reporting policies. Denison's findings were reasonably based on the particularized evidence before it at the time. The record now before the Court supports the Board's findings that Ms. Shanahan violated her reporting obligations and conduct standards as a faculty member.

Accordingly, Ms. Shanahan has failed to establish that Denison's nondiscriminatory reason for her termination was pretext for disability discrimination, and Denison would overcome a finding of pretext anyway because of its reasonable reliance on the particularized evidence before it at the time. Denison is entitled to summary judgment on the disability discrimination claim.

### B.  Gender Discrimination Claim

Ms. Shanahan claims that Denison discriminated against her under Ohio law based on her gender. (ECF No. 30, PageID 1828.) But in response to Denison's motion for summary judgment, she fails to raise any substantive argument or cite to any evidence in the record to support her claim. Rather, she asserts that genuine issues of material fact exist regarding "Denison's failure to

properly investigate whether or not Dr. Shanahan had failed to report [an] alleged violation under its Title VII regime disparately impacted a person with PTSD." (ECF No. 30, PageID 1828.) Such a bare, conclusory claim with no mention of the role Ms. Shanahan's gender or the role it might have played in Denison's decision to terminate her employment cannot suffice to defend her claim at summary judgment.

As explained above, Denison has provided substantive evidence supporting its nondiscriminatory reason for termination Ms. Shanahan's employment. Ms. Shanahan plainly fails to refute that basis for her termination with any argument regarding her gender. For example, Ms. Shanahan fails to argue or provide any evidence that she was replaced by a member outside of her protected class or that a comparable non-protected person was treated better than her. *See Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 725 (S.D. Ohio 2006). Her claim thus falls short of the gender discrimination standard under Ohio law and federal law. *See id*. at 724–25 (explaining the federal gender discrimination standard and that Ohio law follows the same standard).

Denison has met its burden, and Ms. Shanahan has not met hers. Denison is entitled to summary judgment on Ms. Shanahan's Ohio law gender discrimination claim.

## V.     Retaliation

Ms. Shanahan claims that Denison retaliated against her for disability-based protected conduct and gender-based protected conduct. The Court considers both claims in turn.

### A.  Disability-Based Retaliation

Again, the Court applies an ADA analysis to disability retaliation claims under Ohio law. *See Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1058, 1065 (S.D. Ohio 2020). The familiar *McDonnel Douglas* burden shifting framework explained above also applies to disability-

based retaliation claims based on indirect evidence, as here. *Id.* at 1066. Thus, the plaintiff must first prove a prima facie case of retaliation by demonstrating "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* at 1067 (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014)).

Ms. Shanahan fails to meet her burden on her disability-based retaliation claim on multiple fronts. First, to prove that she engaged in protected activity, she only relies on her accommodation request as stated in the Brescoll Email. (ECF No. 30, PageID 1827.) As this Court determined above, the Brescoll Email does not constitute a disability accommodation request because it sought to accommodate her relationship with Student A rather than Ms. Shanahan's PTSD. Therefore, there is no genuine issue of fact about whether she engaged in protected, disability-based activity.

Even if Ms. Shanahan engaged in such activity, she does not identify support in the record for her argument that Denison retaliated against her because of her protected activity. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quotations omitted). Ms. Shanahan fails to produce any credible evidence that Denison retaliated against her because of her request for PTSD-related accommodations. Instead, she asserts only that "her job performance was never questioned until she asked for an accommodation, which constitutes protected activity." (ECF No. 30, PageID 1827.) That assertion, without any further argument or evidence in the record to support it, is not enough to raise an inference that her protected activity likely caused Denison to terminate her employment.

Regardless, as discussed above, Denison has demonstrated a nondiscriminatory basis for

terminating Ms. Shanahan's employment, and Ms. Shanahan makes no new arguments to undermine Denison's evidence in support of that rationale for her termination.

For these reasons, Denison is entitled to summary judgment on Ms. Shanahan's disability-based retaliation claim under Ohio law.

### B. Gender-Based Retaliation

The same burden-shifting framework explained above applies to Ms. Shanahan's Ohio law claim that Denison retaliated against her for gender-based protected activity. *See Blessing v. Ohio Univ.*, No. 2:09-CV-0762, 2011 WL 6076327, at *18 (S.D. Ohio Dec. 6, 2011). Ms. Shanahan makes no attempt in her Response to identify a basis in the record for gender-based protected activity or a causal connected between such activity and Denison's decision to terminate her employment. (*See* ECF No. 30, PageID 1828.) Accordingly, she has not met her burden to demonstrate a prima facie case of discrimination, and Denison is entitled to summary judgment on this claim.

## VI. Disparate Impact Sex Discrimination under Title VII

Next, Ms. Shanahan brings a disparate impact claim under Title VII for discrimination on the basis of sex. Discrimination claims raised under a disparate impact theory involve employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "To establish a prima facie disparate-impact claim, a 'plaintiff must challenge a specific [facially neutral] employment practice and prove, through relevant statistical analysis, that the challenged practice has an adverse impact on a protected group.'" *Henderson v. AG Container Transp., LLC*, No. 2:21-CV-2088, 2024 WL 4844713, at *4 (S.D. Ohio July 31, 2024) (Watson, J.) (quoting *Phillips v. Gates*, 329 F. App'x

577, 581 (6th Cir. 2009)).

Ms. Shanahan's Complaint and her Response fail to identify any relevant statistical evidence or other evidence of sex-based effects of any employment practices. Accordingly, she fails to meet her burden to show a prima facie case of disparate impact sex discrimination under Title VII, and Denison is entitled to summary judgment on that claim.

## VII.    Title IX Claim

Last, Ms. Shanahan alleges Denison failed to provide support to her as a Title IX complainant. (Compl., ¶ 102.) She claims that Denison failed to respond with adequate investigation, disciplinary action, or remediation efforts and "essentially ignored Dr. Shanahan's reports." (*Id.* at ¶ 103.)[1]

Title IX of the Civil Rights Act provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. The statute covers two types of sex-based discrimination: (1) a school's direct interference with a student's participation in an education program on the basis of sex; and (2) similar indirect inference based on the school being "deliberately indifferent to known acts of student-on-student sexual harassment." *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020) (en banc) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629,

---

[1] Ms. Shanahan's Title IX claim fails for several reasons. But even after the following discussion, unraised and unanswered questions remain. For example, is Ms. Shanahan's claim time barred? *See Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 701 (6th Cir. 2022) (holding that the discovery rule applies to the accrual of Title IX claims for statute of limitations purposes). Is her claim non-actionable since she is no longer a student or since the underlying assault occurred over 30 years ago? The Parties do not explore all those questions in their briefs, and so neither does the Court. Ultimately, Ms. Shanahan fails to allege the requisite injury and provide supporting evidence for it, so her claim fails, mooting these unanswered questions.

647 (1999)). This case concerns the latter type of claim, since it relates to a claim of student-on-student harassment.

Ms. Shanahan alleges that Denison was deliberately indifferent to her 2017 Title IX report (and related communications) of the sexual assault that occurred when she was an undergraduate student at Denison in the 1980s. (Compl., ¶ 105.) A prima facie case of deliberate indifference under Title IX includes four elements: (1) the school had "actual knowledge of severe, pervasive, and objectively offensive sexual harassment," (2) the school responded to the harassment in a way that was "clearly unreasonable in light of known circumstances," (3) the school's response "subjected the student to further actionable harassment," and (4) "the further harassment caused the plaintiff's Title IX injury." *Doe v. Univ. of Kentucky*, 959 F.3d 246, 251 (6th Cir. 2020) (quotations omitted) (citing *Davis*, 526 U.S. at 650; and *Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613, 620–24 (6th Cir. 2019)).

Ms. Shanahan's claim fails because she fails to present evidence that she suffered any "further actionable harassment" resulting from Denison's response to her reports of prior harassment. In the Complaint, Ms. Shanahan generally alleges that Denison's conduct caused her economic and non-economic damages, but she does not allege any further sexual harassment. (Compl., ¶ 108.) In her Response to Denison's Motion for Summary Judgment, Ms. Shanahan fails to identify any evidence of actionable sexual harassment occurring after she made Denison aware (in 2017) of her sexual assault by John Doe that occurred when she was an undergraduate student at Denison in the 1980s. Regarding her 2017 Title IX report, Ms. Shanahan acknowledged that Mr. Gauger, Denison's Title IX Coordinator at the time, "handled the matter professionally and supportively." (Compl., ¶ 12.)

Ms. Shanahan argues that Denison's response to her Title IX complaint "worsened her

trauma." (Resp., PageID 1820.) But even accepting that fact as true, she does not explain how her worsened trauma constitutes additional "severe, pervasive, and objectively offensive sexual harassment." *Doe*, 959 F.3d at 250–51.

Because there is no genuine issue of material fact regarding whether Ms. Shanahan experienced further actionable sexual harassment, the Court need not determine whether Denison reasonably responded to Ms. Shanahan's 2017 Title IX report. The Court also need not decide whether the November 2021 Brescoll Email constituted a second Title IX report or otherwise updated her initial Title IX report because Ms. Shanahan does not present evidence of further harassment at any time after the initial report in 2017, let alone after the Brescoll Email.

Accordingly, Denison is entitled to summary judgment on Ms. Shanahan's Title IX deliberate indifference claim.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **GRANTS** Denison's Motion for Summary Judgment. (ECF No. 23.) Ms. Shanahan's claims are **DISMISSED with prejudice**. Denison's Motion to Strike Affidavit in Opposition to Motion is **DENIED**. (ECF No. 35.)

The Clerk is **DIRECTED** to terminate this case on the Court's docket.

**IT IS SO ORDERED.**

7/2/2025                                    s/Edmund A. Sargus, Jr.
**DATE**                                   **EDMUND A. SARGUS, JR.**
                                           **UNITED STATES DISTRICT JUDGE**